## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| JASMINE VALE, for herself and on behalf of her minor child, LEYALINA LAZAR; and KHAMME LAZAR, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. |
| v. | ) ) | Judge |
| THE CITY OF CHICAGO; Chicago police officers GUILLERMO TELLEZ-SANDOVAL, JR. (star #19148); JASON M. BALA (#9112); NOEL ESQUIVEL (#7419); KRISTEN T. MORGALA (#7738); LUCIAN C. MUNTEAN (#7885); EDUARDO ESCALANTE (#7885); MATTHEW E. SANCHEZ (#10159); LLOYD J. MOCK (#12683); MOHAMMED K. AHMED (#16497); SGT. EDUARDO ESCALANTE (#2295); ANGEL D. AVALOS, JR. (#17953); ANGEL O. COLLAZO (#4679); MARK E. HOSS (#9126); AMIN ELMESQUINE (#17593); LT. FRED J. MARCELLINO (#2108); and other CURRENTLY UNKNOWN CHICAGO POLICE OFFICERS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Magistrate Judge |
| Defendants. | ) ) ) | Jury Demanded |

## COMPLAINT

### Summary

1.      Plaintiffs, by and through their attorney, The Law Offices of Al Hofeld,

Jr., LLC, bring this action against defendants City of Chicago and multiple Chicago police

officers pursuant to 42 U. S. C. § 1983 and Illinois state law for needlessly traumatizing a young

child, her mother and grandmother and violating their Constitutional rights.  Plaintiffs allege as

follows:

2. Late Thursday night, February 27, 2020, Jasmine Vale, her 4-year-old daughter, Leyalina Lazar, and Leyalina's 70-year-old grandmother, Khamme Lazar, were in bed or getting ready for bed in their apartment at 1529 W. Pratt, Garden West, in Chicago. Jasmine, a nail technician, was finishing up practicing on her dummy nails in the back of the apartment. Moments earlier, Leyalina had awoken from a bad dream and gone to the living room to sit on her grandmother's lap while Khamme was saying her nighttime prayers at her prayer alter in the living room. Khamme was seated on a stool just a few feet across from the front door to the apartment.

3. Suddenly, between 11:00AM and midnight and without knocking or announcing their office, approximately 15 plain-clothed, male, Chicago police officers with guns drawn and hats covering their faces – but no body cameras - rammed Khamme's apartment front door once, causing it to fly open. (Based on tip from a John Doe informant that officers did nothing to verify, they had a search warrant for Khamme's son, Jesse Lazar, who had actually lived in California for several years. The suspected crime was that Mr. Lazar possessed a handgun without a FOID card.)

4. Immediately training their rifles and handguns at Khamme's and Leyalina's heads and bodies as Khamme held 4-year-old Leyalina in her lap and arms, officers streamed into the apartment as Khamme leapt to her feet in shock, Leyalina still in her arms, and screamed repeatedly, "WHAT'S WRONG? WHAT'S WRONG? WHAT'S WRONG? WHAT'S WRONG?" When Khamme leapt up in shock, her rosary broke in her hands. Officers moved closer and trained their guns on her and Leyalina as she continued to hold Leyalina vertically. Terrified, Khamme froze and urinated on herself.

5. Leyalina saw the guns pointed at her "Nanna" (grandmother) and she was terrified.

6. Hearing commotion in the front of the apartment, Leyalina's mother Jasmine came towards the living room. As she walked through the hallway, she saw men with hats covering their faces pointing handguns at Khamme and Leyalina. One officer turned and came down the hallway towards her. He trained his rifle with a light on it directly on Jasmine's face and head and screamed, "GET ON THE FUCKING FLOOR, BITCH! GET THE GROUND! I'M NOT FUCKING KIDDING!" After she was face-down on the floor, the officer continued to point his rifle at her head for several minutes. Terrified, Jasmine cried and urinated in shorts. The officer then pulled her up and walked her into the living room at gun point.

7. In the living room, Leyalina saw officers pointing guns at her mother. Officers then had the family sit down on the couch and continued to point guns at them for several minutes while other officers began searching. Jasmine repeatedly asked officers to take the guns off of Leyalina and to stop cursing in front of her. They refused and callously told her Leyalina would not be traumatized.

8. At all times, officers' guns were loaded, and their fingers were on the triggers. Jasmine, Khamme and Leyalina followed all officer instructions from the moment of entry. They did not pose any apparent, actual or possible threat to the officers whatsoever at any time. They repeatedly asked the officers what was going on. Officers ignored all of their questions. They refused to show or provide a copy of the search warrant until the moment they departed. They refused to give their names and badge numbers. They were rude, sarcastic, disrespectful, patronizing, and joked at plaintiffs' expense. They were unprepared to deal with a young child.

3

9. During the ensuing search, officers completely tossed every room in plaintiffs' apartment and needlessly damaged plaintiffs' personal property. When Khamme asked them to go easy, they threw more things around, made more of a mess, and damaged more things. They cut couch pillows open, dumped clothes, damaged dressers and tables. They threw Jasmine's nail products all over the floor and destroyed her technician's table, costing her thousands of dollars. They even destroyed Khamme's Christmas decorations and ripping or cutting open Leyalina's prized stuffed animals, "bunny Sarah" and "monkey."

10. In the end, the terror and stress to plaintiffs was for naught: officers did not find a handgun or any of the items referenced in the warrant, and they did not arrest anyone. In other words, this was another in a series of bad search warrants by Chicago police that has traumatized yet another innocent, law-abiding family, and destroyed their trust in the Chicago police.

11. Officers did not apologize or explain to the family. They did not tell them how to ask the City to make repairs pay a damage claim. They simply left, slamming door behind them and discarding their search gloves on the ground in front of the building.

12. On information and belief, none of the officers were wearing body cameras, except for two patrol officers who remained outside the entire time.

13. Officers' display of excessive force towards 4-year-old Leyalina, her mother and grandmother was not a rogue or isolated event: it was undertaken pursuant to the City of Chicago's systemic, unofficial policy of using excessive police force against children and their families in the children's presence, as elaborated below.

14. As a direct result of this incident, all plaintiffs now suffer severe, long-term, emotional and psychological distress, including symptoms of Post-Traumatic Stress Disorder.

### JURISDICTION AND VENUE

15. This action arises under 42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658 (1978). This Court has jurisdiction pursuant to 28 U. S. C. §§ 1331 and 1343. The Court has supplemental jurisdiction of plaintiffs' state law claims.

16. Venue is proper pursuant to 28 U. S. C. § 1391(b). The underlying events occurred within the Northern District of Illinois; defendant City of Chicago is a municipal corporation located within the District; and all parties reside in the District.

### PARTIES

17. At the time of all relevant events, plaintiff Jasmine Vale was a 28-year-old mother residing with her daughter at 1529 W. Pratt Boulevard, Garden West apartment, in Chicago. Ms. Vale has never been arrested or had guns pointed at her. Police had never been to her home.

18. At the time of all relevant events, plaintiff Leyalina Lazar was a 4-year-old girl residing with her mother and grandmother at 1529 W. Pratt Boulevard, Garden West apartment, in Chicago.

19. At the time of all relevant events, plaintiff Khamme Lazar was a 70-year-old grandmother residing with her granddaughter at 1529 W. Pratt Boulevard, Garden West apartment, in Chicago. Ms. Lazar speaks Arabic and Assyrian. She has no criminal record of any kind.

20. Plaintiffs are Latinx and/or Iraqi-American.

5

21.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

22.     At the time of all relevant events, defendant officer Guillermo Tellez-Sandoval (star # 19148) was an undercover Chicago police officer assigned to the Area North Gang Enforcement Division.  He was the affiant of the complaint for search warrant for 1529 W. Pratt Boulevard, Garden apartment West, and he led the investigation that resulted in the complaint for search warrant and the search warrant.  Additionally, officer Tellez-Sandoval, along with several other members of Area North Gang Enforcement, entered plaintiffs' apartment and executed the search warrant.

23.     At the time of all relevant events, on information and belief defendants Jason Bala (#9112), Noel Esquivel (#7419); Lucian Muntean (#7885); Sgt. Eduardo Escalante (#2295); Matthew Sanchez (#10159); Lloyd J. Mock (#12683); Mohammed K. Ahmed (#16497); Angel Avalos, Jr. (#17953); Angel Collazo (#4679); and Mark E. Hoss (#9126) were undercover Chicago police officers assigned to Area North Gang Enforcement.  Along with defendant Tellez-Sandoval and Patrol Division officers Amin Elmesquine (#17593) and Kristen T. Morgala (#7738) also entered plaintiffs' apartment and executed the search warrant and otherwise assisted in its execution.

24.     On information and belief, defendant Lt. Fred Marcellino (#2108) approved officer Tellez-Sandoval's search warrant.

25.     However, despite plaintiffs' inquiries, CPD has so far refused to identify the names or star numbers for all of these officers who participated in the execution of the search

warrant.[1]  As soon as plaintiffs obtain sufficient information identifying the remaining officers who should be defendants, they will name all defendants in an amended complaint.

26.     When Chicago police officers executed their search warrant at 1529 W. Pratt Boulevard, Garden apartment West, they were at all times acting under color of law and within the scope of their employment as officers of the Chicago Police Department ("CPD") for the City of Chicago.

### Overview:  CPD's M. O. is Excessive Force, Including Against and in the Presence of Children and Youth

27.     Chicago police officers have a *de facto* policy, widespread practice or *M. O.* of using unnecessarily or excessive force against citizens of color, including children and youth, and against their adult family members in front of the children, which traumatizes them.

28.     The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that CPD has a pattern and practice of using excessive force against citizens, including children.  https://www.justice.gov/opa/file/925846/download at 34. DOJ also found that CPD's uses of force, whether reasonable or unreasonable, disproportionately involve Chicago's citizens and youth of color, especially African-Americans.  (Id. at various). DOJ also found that CPD's excessive force runs the gamut of specific types of force and includes pointing guns at citizens.  (Id.).

---

[1] In response to plaintiffs' FOIA request, CPD produced the Search Warrant Data sheet that contains the names and general roles of most officers who participated in executing the search warrant.  However, during the February 27, 2020 raid, the undercover officers were not wearing badges and nameplates and, when asked by plaintiffs, they all refused to provide their names and badge numbers or indicate which district they were from.  In addition, plaintiffs believe at least two body camera videos of portions of the raid exist, but CPD has so far declined to produce them.  Finally, in addition to this early discovery that plaintiffs will seek in order to make sure they have identified all of the correct defendant officers, in order to facilitate identification of the officers who committed specified conduct plaintiffs will also request the official CPD photos of the officers involved in the raid.

7

29. In addition, the 2016 report of the mayoral-appointed Chicago Police Accountability Task Force ("PATF") contained similar or parallel conclusions. Among other things, it concluded that most CPD officers are not trained or equipped to interact with youth. https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf at 55. PATF recommended a number of specific reforms, including training, in order to improve police interactions with youth so as not to traumatize them. (Id.)

30. Despite clear, actual notice of these findings, CPD and the City did not subsequently implement any changes in CPD policy, procedure or training in order to remedy or otherwise address officers' practice of using excessive force against or in the presence of children. Further, none of the reforms and new training that CPD did undertake in the wake of the DOJ and PATF reports addressed Chicago police officers' use of excessive force against children.

31. For instance, following the release of the DOJ report in 2017, CPD revised its use of force policy, GO3-02, but did not include any changes that expressly require officers not to refrain from pointing guns at or using force against or in the presence children, when possible, or to otherwise use a trauma-informed approach to the use of force in situations where children are present. Nor did CPD's 16-hour officer training that accompanied implementation of the new use of force policy include any instruction regarding the use of force and children or the pointing of guns at them or others.

32. Similarly, through 2019, CPD did not revise its search warrant policy, SO9-14, or its search warrant training to include any requirements or instruction that officers refrain from pointing guns at or using force against or in the presence children, when possible, or use a trauma-informed approach to the use of force in situations where children are present.

8

33.     Moreover, in the federal consent decree the City agreed to with the State of Illinois and that was entered by Judge Dow in January, 2019 in *State of Illinois v. City of Chicago*, 17-cv-6260, the City did not commit to any reforms to remedy the problem.

http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf

34.     Further, unlike other major U.S. metropolitan police departments - such as New York, Cleveland, Indianapolis, Charlotte, Baltimore and San Francisco - CPD still does not have any policy or provide any training on policing children and youth in ways that are trauma-informed and that avoids exposing them to police violence.

35.     In addition, the traumatic and long-lasting impact on children's health from exposure to violence is well-established scientifically and well-understood by the City of Chicago.  Indeed, until approximately 2012 the Chicago Department of Public Health had a program, Chicago Safe Start, that trained officers in two police districts about the impact on young children of exposure to violence.  Nevertheless, the City cut and effectively terminated this training and failed to replaced it, even after receiving actual notice of the above findings regarding police and children in the DOJ and PATF reports.

36.     In other words, despite the City's extensive knowledge, *via* Chicago Safe Start, that exposure to violence has a traumatic impact on children, CPD never implemented any policy or training to prevent officers themselves from harming children by pointing guns at them or using other unnecessary or excessive force against or in the presence of children.

37.     It is also widely known by CPD, which extensively patrols "high crime" neighborhoods in Chicago, that many poor children of color have already been exposed to violence and trauma in their neighborhoods.  Therefore, in such neighborhoods CPD officers

*expect* to encounter children with a preexisting history of trauma. Nevertheless, despite this knowledge and expectation, CPD failed to require or train officers to avoid pointing guns at and otherwise using excessive or unnecessary force against and in the presence of children, with the result that their continued use of excessive force has compounded the trauma of the children they encounter.

38. On January 3, 2020, in response to over a year of lawsuits and media coverage regarding officers pointing guns at and handcuffing children, CPD revised its search warrant policy and training to nominally require officers to "maintain a sensitive approach and use due care to safeguard the physical and emotional well-being" of any children present "to minimize trauma following the execution of a search warrant." (SO-19 VIII. E. 3.). However, both the nebulous policy and the officer training done on the new policy during January and February, 2020, fails to require officers to refrain from pointing guns at or otherwise using excessive or unnecessary force against or in the presence of children. Moreover, CPD has failed to enforce its new policy through appropriate discipline.

39. The new search warrant policy also requires two body worn cameras to enter the residence with the search team *via* two uniformed patrol officers ( - only patrol officers are mandated by CPD to wear body cameras). However, this did not happen; both patrol officers remained outside for the entire duration of the raid, even though one was female and could have been more useful and effective than the male officers in calming the female plaintiffs, especially Leyalina.

## FACTS RELATING TO ALL COUNTS

### *Chicago Police Obtain a Residential Search Warrant for Someone Who Had Lived in California for Several Years*

10

40.     At approximately 10:33PM on February 27, 2020, defendant officer Tellez swore out and obtained a search warrant authorizing a search of Jesse S. Lazar, AKA "J," and the premises at 1529 W. Pratt Boulevard, garden apartment, in Chicago.  The warrant authorized the seizure of firearms, any ammunition, and any residency documents.

41.     Officer Tellez's complaint for search warrant stated, entirely erroneously, based solely on unverified information from a John Doe confidential informant with an extensive criminal background, that Mr. Lazar was in possession of a handgun inside 1529 W. Pratt Boulevard, garden apartment, in Chicago.  The John Doe claimed he had visited Mr. Lazar there on multiple occasions (but the complaint does not state when or how recently).  The John Doe did not claim he resided there, according to the complaint for search warrant.

42.     The crime of which Mr. Lazar was suspected was possession of a firearm without a Firearm Owner's Identification ("FOID") Card.

43.     The problem was that, on information and belief, officer Tellez and any defendant officers assisting him in the search warrant investigation, did not bother to perform the simplest, most routine verification of the John Doe's representation that Lazar could be found at 1529 W. Pratt Boulevard, garden apartment, in Chicago.  In fact, Mr. Lazar had not resided there in several years; he resided in California.

44.     They could have made any of a number of simple inquiries.  They could have checked the Illinois Secretary of State database.  They could have run a person search on Lexis Nexis.  They could have performed minimal surveillance of the back of the building from the alley.  They could have contacted the building's owner, landlord or management company.  They could have contacted, or asked the state's attorney to subpoena, a utility company supplying energy to the building or apartment.  They could have utilized CPD's database,

11

Accurint, which matches addresses with names. They could have done basic surveillance of the building.

45.     Had they taken any of these steps, they would have discovered that Mr. Lazar was located in California at about the time the John Doe claimed to have visited him at 1529 W. Pratt Boulevard.

46.     Thus, on February 27, 2020, officer Tellez and any defendant officers assisting him in the search warrant investigation knew or should have known Mr. Lazar could be found at 1529 W. Pratt Boulevard, did not reside there, and had not lived there for several years. But defendant officer Tellez and any defendant officers assisting him in the search warrant investigation failed to perform the most minimal verification of the most basic information provided by the John Doe, who they knew was not trustworthy. Instead, they recklessly assumed and acted as though Mr. Lazar resided or could and would be found there.

47.     The facts that a Chicago police officer alleges in a complaint for search warrant are required to be "credible and reliable." (CPD SO4-19, VI.B.a.). To this end, a Chicago police officer swearing out a search warrant under oath before a judge is required to "thoroughly conduct[]" the "investigation leading up to the need for a search warrant." (CPD SO4-19).

48.     And, crucially, CPD SO4-19 requires the affiant of a complaint for search warrant to *independently* investigate and verify the information provided by a John Doe confidential informant, including the information about where the intended target resides or can be found.

49.     In other words, as the sworn applicant for the warrant, officer Tellez had a duty to discover, diligently and in good faith, and disclose to the issuing warrant judge whether

he had identified the correct apartment or place to be searched (and not the residence of an innocent third party, like plaintiffs).

50. All of this was and is required because the law respects citizens' Fourth Amendment rights, including the Fourth Amendment rights of innocent citizens who are not criminal suspects.

51. In direct violation of CPD policy and the Fourth Amendment, officer Tellez and any defendant officers assisting him in the search warrant investigation, as well as any CPD lieutenant who presumably approved Tellez's complaint for search warrant, as required, performed zero independent investigation or surveillance to verify that Mr. Lazar resided or could be found at 1529 W. Pratt, as the John Doe confidential informant told him.

52. They neglected to conduct any investigation, any verification, as was required by SO4-19. They simply trusted what the criminally active John Doe told them was true.

53. Consequently, officer Tellez's sworn complaint for search warrant was fundamentally and recklessly inaccurate about who was inside 1529 W. Pratt, basement apartment, or where Mr. Lazar could be found. Therefore, in spite of what he and the assisting officers told Judge David Navarro, the Chicago police did not have probable cause to believe that Mr. Lazar could be found there and, therefore, to enter and conduct a search at that address.

54. Because officer Tellez, any officers assisting him in the investigation, and the lieutenant who was supposed to approve the complaint for search warrant failed in what they knew was their minimal official duty to independently investigate and verify the location of the person to be searched, theirs was not a good faith error.

55. Moreover, the copy of the search warrant provided to plaintiffs is not signed by a CPD lieutenant, per CPD policy and practice. On information and belief, the CPD lieutenant who approved officer Tellez's complaint for search warrant, believed to be defendant Lt. Fred Marcellino, simply "rubberstamped" it, without taking any steps to ensure that officer Tellez had performed the due diligence required by CPD Special Order S04-19. Taking these vital steps was what the lieutenant was officially required to do pursuant to S04-19. In the alternative, officer Tellez improperly applied for and obtained the search warrant without first securing the approval of a CPD lieutenant or higher supervisor, as specifically required by S04-19.

56. On February 27, 2020, defendant officer Tellez, any officers assisting him in the investigation, and the approving CPD lieutenant reasonably knew or should have known that the intended target of the search warrant did not reside and could and would not be found there. They had very good reason to know that the information contained in officer Tellez's sworn complaint for search warrant that was presented to Judge Navarro was materially inaccurate because they had done zero corroboration, verification or investigation.

57. Moreover, as is customary for CPD, no defendant officer, in the course of obtaining and executing the search warrant, took any steps to first determine whether any children resided in the basement unit or in the house, to avoid entering at times when children were likely to be present, to plan their entry and use of force tactics in light of the anticipated presence of children, or to deescalate their use of force tactics if and when they unexpectedly encountered young children in the basement apartment at 1529 W. Pratt. As a result, officers injured Leyalina.

*Officers Point Guns at 4-Year-Old Leyalina, Her Mother and 70-Year-Old Grandmother*

14

58.     Between 11:00AM and midnight on Thursday, February 27, 2020, Jasmine Vale, her 4-year-old daughter, Leyalina Lazar, and Leyalina's 70-year-old grandmother, Khamme Lazar, were home in bed or getting ready for bed.  Jasmine, a nail technician, was finishing up practicing on her dummy nails in the back of the apartment.  Moments earlier, Leyalina had awoken from a bad dream and gone to the living room to find her mother or grandmother.  She climbed into her grandmother's lap, then her grandmother held her with her tummy on her chest and her head over her shoulder.  Khamme was seated on a stool in front of her prayer altar in the living room, saying her nighttime prayers and holding her rosary.  She was seated on a stool just a few feet front the front door of her garden apartment.

59.     Suddenly, without knocking or announcing their office, approximately 15 Chicago police officers with rifles and pistols drawn and armed with a sledge-hammer, a door ram, a Chicago bar, and a ballistic shield - but no body cameras - rammed through the common entry doors to plaintiffs' apartment building, then rammed Khamme's apartment front door once, causing it to fly open.  Uniformed officers with body cameras remained outside the entire time.

60.     The moment the front door flew open, Khamme, startled and shocked, jumped up with Leyalina in her arms and repeatedly screamed, "WHAT'S WRONG?!  WHAT'S WRONG?! WHAT'S WRONG?! WHAT'S WRONG?! WHAT'S WRONG?!"  Ignoring her, officers charged in and immediately pointed their rifles and handguns at Khamme's chest and at Leyalina's body.  Khamme was holding Leyalina vertically.  Khamme did not know the men were police.

61.     When Khamme jumped up in shock, her rosary broke in her hands.

62. When Khamme saw the guns pointed at her and Leyalina, instantly she froze. Her lips felt numb. She felt like she could not speak. She felt like she went blind or blacked out. Almost immediately, she urinated on herself.

63. Officers then came even closer to Khamme and trained their guns on her and Leyalina as she held Leyalina in her arms. Every officer in the apartment pointed his gun at them. The guns were about three feet from their bodies and pointed at their chests.

64. Leyalina saw the guns pointed at her and her grandmother, and she was terrified.

65. Khamme's face soon turned sheet-white with shock, her lips turned blue, her mouth became dry, and she began shaking and holding her chest. Officers refused to do anything to help her. She repeatedly asked to go to the bathroom; officers would not let her. She repeatedly asked if she can get some water to drink; officers would not let her.

66. The plain-clothed men with hats covering their faces did not identify themselves as police officers at first. Once they were inside of the apartment, they said "Police, police, we have a search warrant from a judge," but they did not show it or provide a copy until the very end.

67. Hearing noise and commotion, Jasmine began walking down the long hallway towards the front of the apartment and the living room to investigate. As she passed Khamme's bedroom on the way to the living room, she saw plain-clothed men with hats covering their faces pointing handguns at Khamme and Leyalina.

68. As she passed through Khamme's bedroom on her way to the living room, one officer turned and came down the hallway towards her. He pointed a rifle or machine gun with a light on it directly at Jasmine's face and head. The light was aimed directly in her eyes,

16

and it blinded her. As the officer got closer, he pointed his rifle directly in Jasmine's face, within a foot of touching her face with the barrel.

69. This officer did not announce himself to Jasmine as a police officer. Jasmine did not know this man or any of the men were police officers because they still had not identified themselves as officers or mentioned a search warrant to her. She did not realize these men were police officers for several minutes.

70. Jasmine was so terrified as he came towards her with the gun trained on her that she urinated in her shorts. She was dressed in her pajamas, a t-shirt and shorts. Her shorts soon became visibly wet, she had to wear them for the duration of the search, and she was humiliated.

71. After the officer reached her, he put the gun directly in her face, he said, "GET ON THE FUCKING FLOOR, BITCH! GET ON THE GROUND! I'M NOT FUCKING KIDDING!"

72. Jasmine complied, but the officer simultaneously and impatiently grabbed her shoulder with one hand and dragged her to the floor. At first, she lay face-down on the floor and started crying. In response to the officer's demeaning and life-threatening words and actions, Jasmine managed to blurt out, "THERE'S A BABY IN HERE!"

73. Once she was down on the floor, the officer pointed his rifle or machine gun directly at Jasmine's face and head, inches from touching her. While face-down on the floor and terrified, she kept saying, "Oh God, Oh God, Oh God." The officer kept Jasmine on the floor in this position with the gun aimed point blank at her head for approximately 2-3 minutes while officers searched the rear rooms of the apartment.

74.     While on the floor, Jasmine tried to look up at the living room to see what was happening to Leyalina.  While Jasmine was on the floor, Leyalina, hearing her mother scream, left Khamme and tried to go to Jasmine, but officers stopped her.

75.     Next, the officer physically pulled Jasmine off the hallway floor.  As she was getting up, he knocked her phone out of her hand.  Once she was on her feet, he physically pushed her towards the living room.  As she looked back thinking of her dog in the back of the apartment, she saw the officer had his rifle or machine gun trained at the back of her head as she walked towards the living room.

76.     When Jasmine entered the living room with the officer still training rifle or machine gun at the back of her head, Leyalina saw the gun pointed at her mother and instantly started screaming, "MOMMY, MOMMY!"  She started to run towards her mother.  Officers physically grabbed and blocked her, stopping her from going to her mother.

77.     When Jasmine entered the living room, the officers in the room were still pointing their guns at Khamme and Leyalina.  In fact, multiple officers continued to keep their pistols drawn and pointed at Jasmine, Leyalina and Khamme for several additional minutes while other officers started searching throughout the apartment.

78.     In the living room, at first officers ordered Jasmine to sit down at the dining room table in front of Khamme's prayer station, next to Khamme and Leyalina, as they continued to point their handguns at them.  Later, after Jasmine asked, officers allowed Leyalina to sit on Jasmine's lap.  Jasmine also tried to calm Khamme, who was still shaking.  Later still, officers moved the family to the couch so that they could search the bar area.

79.     Once Jasmine, Khamme and Lealina were all in the living room, Jasmine and Khamme repeatedly asked officers, "Who are you?  What are you doing here?  What's going

on? What do you want?" Officers would not answer any of their questions. They refused to tell plaintiffs which police district they were from or anything about their team or themselves.

80. Plaintiffs spoke respectfully to officers the entire time. Officers treated with plaintiffs with disrespect and insults, like criminals, and made them feel dehumanized.

81. During this time, Jasmine said, "I don't want my daughter being traumatized. Can you take the guns off of her?"

82. Officers did not take their guns off Leyalina, Khamme or Jasmine. Instead, one officer replied to Jasmine, "No, your daughter is not going to be traumatized." Another one said, "she'll be fine" and then threatened her: "If you cooperate, she'll be fine."

83. At another point, Jasmine asked officers to please stop using foul language in front of her daughter.

84. Not long after Jasmine sat down in the living room, for no reason officers made another threat; for no apparent reason, they threatened to report her to the Department of Children and Family Services. "If you don't cooperate, we're going to call DCFS on you." There was nothing to report, but officers wanted to threaten Jasmine as a tactic. Leyalina heard this threat and understood it, and it made her anxious and insecure.

85. Officers were not prepared to deal with a young child.

86. All of the officers on the entry and search teams were male. Although there was a female police officer on the scene the entire time, she never came inside to talk to or calm the three female detainees, especially Leyalina.

87. During the ensuing search, officers tossed the apartment, ripped up plaintiffs' belongings and even ripped Leyalina's prized stuffed animals, "bunny Sarah" and "monkey."

19

88.     No matter what Jasmine said or did, officers were not treating them with respect.

89.     With the family gathered in the living room, officers proceeded to question Jasmine and Khamme and even Leyalina and to search the apartment.  They asked Jasmine and Khamme for ID.  Multiple officers remained with the family in the living room during the entire time.

90.     Officers asked Khamme, "Where are you from"?  She answered that she is Iraqi, Christian, originally from Baghdad and that she has been in the U. S. for 40 years.

91.     They asked Jasmine, "Ever been arrested?"  Then they called her "stupid."

92.     They asked her where Jesse Lazar is, and she told them she did not know.  The officer responded, "We're starting this off badly."

93.     Officers questioned Leyalina without her mother's permission and tried to trick her into giving information, asking "Where's daddy at?"

94.     Officers left the apartment front door, which opens into the living room, open the entire time they were in the home.  When the family, who did not have coats, mentioned they were cold and asked if they could close the front door, officers rudely refused and told them to "grab a blanket."  Jasmine, Khamme, and Leyalina all got colds the next day as a result of being forced to sit in the cold for over an hour.  Leyalina had just gotten over a months-long cough.

95.     When Jasmine continued to ask why officers were there, one replied that an informant had stood in front of a judge and said there were two unregistered firearms in a safe with ammunition and drugs in the apartment.  In fact, there were not, and officers did not find any contraband in the apartment and did not arrest anyone.

20

96.     Later, from the way these men spoke to and treated she, her daughter and Khamme, Jasmine could not believe they were police officers.

### *In a Fruitless Search, Officers Exceed the Scope of the Search Warrant and Intentionally or Recklessly Damage Plaintiffs' Property*

97.     Officers searched the entire apartment, as well as physical areas outside the apartment that they were not authorized to search.

98.     They exceeded the scope of the search warrant in another way:  they conducted a minute search for illegal drugs when they were not mentioned in the search as items to be seized.  This caused additional damage to plaintiffs' property.

99.     In the living room, they lifted, opened, and tossed all of the couches, looked under the rug, looked in the bar where her prayer station is, looked in Khamme's purse and in her medication box.

100.    Officers searched in the freezer, in cabinets, on shelves, and in the ceiling.

101.    They searched throughout Khamme's bedroom, turning the room and all her clothes upside down.  They messed up the kitchen and the bathroom.

102.    When Khamme asked officers nicely to please go easy on her belongings and not make a mess, they then vindictively started throwing stuff around more, making more mess, and damaging or destroying more things.

103.    As they searched, they made unprofessional and disrespectful comments about items they found, such as "This is interesting.  Look at what we found."

104.    Officers damaged numerous items during their search.

105.    Heedless of the impact on a child, they cut or ripped open Leyalina's stuffed animals.

106.    Using knives, they ripped open couch pillows to look inside the stuffing.

107.    Officers rammed and pried open the outer and inner entry doors to plaintiffs' apartment building, damaging the wood. Officers dented plaintiffs' apartment front door.

108.    In the backroom, they ripped open and damaged dressers, dresser drawers, tables, a tanning tent.

109.    They threw Jasmine's nail products, including acrylic powder, all over on the floor. They ripped up and destroyed her nail technician's table. In all, they destroyed over $1,000 worth of Jasmine's investment in her small business.

110.    Khamme was storing boxes of stuff for one of her cousins. Officers ripped open the boxes and through the contents everywhere.

111.    They even damaged and broke Khamme's Christmas decorations.

112.    Officers also broke open the garage door entered and searched the garage, including Jasmine's car. They took her car keys out of her jacket and used them to get into her car. They went through her glove compartment and the papers inside and left her car doors open and her registration and other papers scattered all over the garage.

113.    At the end, when Jasmine asked for officers' names and bade numbers, they refused to provide them, and one replied, "We'll meet again."

114.    When officers noticed the property's security cameras towards the end of their search, they jokingly said, "Say Hi!"

115.    When officers left well after 1:00AM on February 28, 2020, they did not leave an evidence recovery log with the family because they did not find any gun, ammunition or other contraband. They did not arrest or charge plaintiffs. They slapped the search warrant on the table as they were leaving, saying they were leaving it for Jesse Lazar.

22

116. Despite being required to do so by the new search warrant order, officers did not notify the City of any damage to the building or give plaintiffs any information about how to contact the City to make a claim for damages or repairs.

117. They did not apologize to plaintiffs for hitting the wrong residence or for the way they treated or spoke to them.

118. When officers left, they slammed the door behind them. They were angry because they had not found the target.

119. As they walked out of the building, they ripped up some paper and threw it and their search gloves on the ground in front of the building.

120. Officers were inside plaintiffs' apartment for over 60 minutes.

121. None of the plain-clothed officers who entered plaintiffs' apartment wore body cameras. At least two uninformed patrol officers who were wearing body cameras remained outside and never entered plaintiffs' apartment.

### *Officers' Use of Excessive Force Against Plaintiffs, Especially 4-Year-Old Leyalina, Was Totally Unnecessary*

122. Plaintiffs presented absolutely no threat, real or apparent, at any time to any of the defendant officers who entered and searched their home. They did not resist, flee, or look anything like the target.

123. Officers quickly discovered – within seconds of entering - that no one in the apartment looked anything like Mr. Lazar who was physically described in the search warrant.

124. Even though plaintiffs presented no threat, defendant officers repeatedly pointed their guns at them, and any who did not point their guns at plaintiffs did not intervene to ask those pointing guns at plaintiffs to stop.

23

125. Plaintiffs have been harmed by officers' unnecessary pointing of guns, unlawful detention, unlawful search of their persons and home, and their destruction of their personal property.

### Officers' Unnecessary Uses of Force Severely Traumatized Plaintiffs, Especially 4-Year-Old Leyalina

126. Chicago police officers' terrorizing conduct towards plaintiffs caused them immediate, serious and lasting emotional and psychological distress.

127. Prior to February 27, 2020, plaintiffs were happy and healthy people in a loving family. They had never had guns pointed at them. They had never suffered any kind of emotional or psychological trauma of any kind. This all changed with defendants' actions.

128. Throughout their encounters with police, plaintiffs were terrified. They were crying and physically shaking throughout the raid. They were afraid they were going to be shot. After the police left, Khamme and Jasmine were unable to go to sleep until approximately 6:00AM and 3:00AM, respectively.

129. At work the next day, Jasmine could not think straight, was nervous and upset, and was unable to concentrate. She irrationally locked all of the doors at the office that day.

130. For weeks and months after the incident, Jasmine, Khamme and Leyalina continued to feel jumpy, jittery, and frazzled. Khamme had high blood pressure; the incident made it worse. She was also put on anti-depressants as a result of the incident.

131. Ever since the incident, plaintiffs have continued to re-live, in various ways, how terrified they were that day. They will not open the apartment door for anyone.

132. They no longer feel safe at home in their apartment. They feel sick to their stomachs every time they have to remember and/or talk about the incident.

24

133. Khamme, who used to sleep soundly at night, now wakes up approximately every two hours during the night. When she does sleep, she jumps and jerks in her sleep. As a result of the incident, she feels something heavy on her chest.

134. Days after the incident, Jasmine suffered a major panic attack and received treatment at the hospital. Her heartbeat was fast and irregular. Her arm was stinging. She was prescribed multiple medications for anxiety and insomnia.

135. Since the raid, Jasmine is not the same mentally. She frequently breaks down and cries, initially every day and now several times per week. This had never happened to her before. She struggles to focus and concentrate. She feels angry, depressed. She has lost confidence in herself. She is less patient.

136. In addition, Jasmine now feels paranoid all the time. She is afraid to leave home. She is scared to take showers, scared to close her eyes and wash her face. Whenever she hears a sound of any kind – a knock, a doorbell, something falling and hitting the floor - she jumps and has to leave the room to calm down. Whenever she sees a police officer or police car, she jumps and feels very uncomfortable.

137. Jasmine is usually unable to fall asleep until 4:00 or 5:00AM because she is unable to relax, prepared, on patrol, hypervigilant. She wakes up frequently during the night, startling at every sound. She, too, jumps and jerks in her sleep. She has nightmares about the incident in which she is unable to move or speak, in which she watches the incident happen, is powerless to stop it and unable to save her daughter. Powerlessness is the recurring theme of her dreams.

138. Jasmine no longer feels safe in her apartment. She lives with a sense of personal violation. During the incident, Jasmine felt helpless and powerless to protect Leyalina.

She understands that the gun could have gone off when it was pointed at any of them. Involuntarily, she goes over the incident again and again in her mind, reliving the scenes and the emotions.

139. Since the incident, 5-year-old Leyalina's behavior has changed dramatically. She did not have any behavior problems before the incident. Now, she does not listen to her mother and grandmother or do what they ask of her. She throws frequent tantrums. She is disrespectful towards authority figures. She is aggressive towards her mother and grandmother, sometimes threatening them and occasionally physically striking them. Having seen her mother and grandmother appear afraid for the first time, she now tries to use that to control them, threatening to call the police on them when she gets mad, saying "I'm going to call the police, and they'll take you."

140. Leyalina is normally a very talkative child who talks about any subject. But for months after the incident, whenever her parents or grandmother would bring it up, Leyalina became visibly aggravated and angry and completely refused to discuss it.

141. Leyalina used to sleep by herself with no problem. Now, she not only insists on sleeping with her mother but must be by someone's side 24/7. She constantly follows her mom around. She cried in her sleep during bad dreams about the incident every night. When she wakes up during a bad dream, she is not normal.

142. Plaintiffs now feel nervous, jumpy, and "on edge."

143. Plaintiffs continue to experience and exhibit, unabated, these and other signs of serious emotional and psychological trauma and distress.

144. On information and belief, plaintiffs have, or have many of the symptoms of, Post-Traumatic Stress Disorder.

145. As a direct result of officers' conduct, plaintiffs are now being medically assessed for trauma inflicted by the Chicago police.

146. On information and belief, plaintiffs will require counseling in order to cope with the long-term, psychological injuries inflicted by defendants' display of excessive force.

147. Officers' shocking actions of repeatedly pointing and training loaded guns at close range on a 4-year-old child and her mother and grandmother constituted serious abuses of power and authority.

148. Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed towards a 4-year-old child. Plaintiffs' sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

149. Officers' conduct was undertaken pursuant to and is part of a long-standing and widespread pattern and practice, *de facto* policy or *MO* of excessive force noted above, which includes the use of excessive force against and/or in the presence of children of color.

### COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM
### <u>AGAINST THE CITY OF CHICAGO</u>
### (Minor Plaintiff Leyalina Lazar Only)

150. Minor plaintiff Leyalina Lazar re-alleges all paragraphs 1-149 above, including the *Monell*-related allegations of paragraphs 27-39 and 149 above, and incorporates them into this count. She asserts this claim, through her mother, against defendant City of Chicago.

27

151.     Defendant officers' use of excessive force against Leyalina was directly and proximately caused by one or more of the following four, specific, long-standing, interrelated, *failures* of official policy, *lack* of official policy, and *de facto* policies, widespread practices, and/or customs of the City of Chicago:  1) a pattern and practice of using unnecessary or excessive force against citizens, including children and youth; 2) a failure to have any policy about when it is appropriate for officers to draw their guns and point them at citizens, including children; 3) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force against citizens, including children and youth and/or their close relatives in the minors' presence; and 4) an absence of official policy and training for officers to refrain from pointing guns at or otherwise using excessive or unnecessary force against or in the presence of children.  Each of these policies existed for more than six years prior to February 26, 2020 ("the *Monell* period") and was the moving force behind the officers' conduct that resulted in the violation of Leyalina's constitutional rights and the direct causal link between the City's actions/inaction and the deprivation of her rights.

152.     First, defendant City of Chicago has a long-standing, pervasive practice and custom of failing to adequately investigate, intervene with and discipline or otherwise correct officers for the use of excessive force against citizens, including children and youth.

153.     Of the hundreds of citizen misconduct complaints filed with BIA, IPRA and COPA during the *Monell* period that involved allegations of officer excessive force against a young child or youth, including pointing guns at them, none were sustained, none resulted in any officer discipline, and the vast majority of complaints were not even investigated.  Moreover, as the DOJ found, all excessive force complaints, including those involving the unjustified pointing of guns, were inadequately investigated, rarely sustained, and even more rarely disciplined.

154. This set of City's widespread practices or customs directly encouraged, sanctioned, authorized and was the moving force behind officers' conduct towards Leyalina. The City's historical failure, leading up to February 26, 2020, to properly intervene in, investigate and discipline officer excessive force, especially excessive force against or in the presence of children and youth, sent officers the clear message that they had a general freedom and license to engage in excessive force, including excessive force against children, without fear of being corrected, investigated or disciplined. This caused defendant officers to act without appropriate restraints towards Leyalina.

155. The City had actual and constructive notice during the *Monell* period of each of these failures of official accountability from a) a long-standing, continual stream of citizen excessive force misconduct complaints to IPRA and COPA that were not properly investigated as well as from b) the specific conclusions reached by and the data contained in the 2017 DOJ and the 2016 PATF reports (see *supra*).

156. Second, contrary to commonly accepted standards and best practices in law enforcement, CPD failed to have any official policy, guidance or training regarding when it is appropriate for officers to draw their service weapons, have their guns out, and point them at citizens, including and especially children. In fact, CPD has long refused and still refuses to refer to an officer pointing a gun at someone as "a use of force." These failures gave officers official legal sanction and free reign to point their guns at citizens, including children like Leyalina, without any official restraint or consequences.

157. Third, defendant officers' conduct towards and in the presence of Leyalina was undertaken as a direct consequence of defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring officers to refrain from

29

pointing guns at and otherwise avoiding the use of excessive or unnecessary force against or in the presence of children or youth when possible.

158. Even after the DOJ and PATF findings regarding force and children were known to final City policy makers in 2016 and 2017 – constituting actual notice to the City - the City failed to implement any reforms to remedy the pattern and practice of excessive force against or in the presence of children and youth. This failure amounted to a deliberate and conscious choice not to take action to prevent future violations of people's constitutional rights, including Leyalina's. In other words, in the wake of the DOJ and PATF findings, the City opted not to adopt any reforms despite the known and obvious risk that the pattern of excessive or unnecessary force noted by DOJ and PATF would lead to constitutional violations in the future. The City knew that, without reforms, children's rights would continue to be violated. Thus, the City's failure to implement reforms was a foreseeable cause of Leyalina's injuries. In particular, the City's decisions not to reform official policies and training include, without limitation:

a. The continued absence of any provision in CPD's official use of force policy that would require or guide officers to refrain from pointing guns at or using excessive or unnecessary force against or in the presence of children and youth or to use a trauma-informed approach to the use of force in situations where minors are present and some force may necessary;

b. CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit requirement or guidance that officers should refrain from pointing guns at or otherwise avoid using excessive or unnecessary force against or in the presence of children and youth or to use a trauma-informed

30

approach to the use of force in situations where minors are present and some force may be necessary;

c. CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (i) whether minors reside in the residence, (ii) to avoid entry and search at times when minors are likely to be present (iii) to plan manner of entry and force tactics based on whether minors are expected to be present; (iv) to de-escalate themselves or change tactics when they unexpectedly encounter children or youth, and/or (v) to take other precautions to avoid traumatizing minors and their close relatives, such as avoiding pointing guns at or placing parents and caretakers in handcuffs in the children's presence;

d. CPD's rebuff, both before and since the U. S. Department of Justice and PATF reports were released, of national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children and/or offered to provide or draft model use-of-force policies that included explicit provision for avoiding excessive or unnecessary use of force against and in the presence of children;

e. City's refusal or failure, despite its extensive knowledge, *via* Chicago Safe Start, of the traumatic effect of exposing children to community violence, to continue, expand, or reinstate any training to prevent officers themselves from harming children by pointing their guns at them or otherwise using excessive or unnecessary force against them or in their presence;

f. City's and CPD's refusal or failure to propose or commit to, in the consent decree it negotiated and is now implementing in *State of Illinois, v. City of Chicago*, 17-cv-6260, any explicit protections for children from officers who would point their guns at them

31

or otherwise not refrain from using excessive or unnecessary force against them and any provisions requiring a trauma-informed approach to policing children.

159. The continual streams of excessive force complaints to IPRA and COPA, including those in which children were complainants or victims, also constituted actual and constructive notice to the City of a pattern and practice of excessive force that required remedial action.

160. Fourth, the City's lack of official policies to protect citizens, including children from officers pointing guns at them and other excessive or unnecessary force, combined with its failure to hold accountable officers who use excessive force, have resulted in a *de facto* City policy and practice of using unreasonable force against citizens, including children and youth, as concluded by DOJ and PATF. This widespread practice was the moving force and direct causal link behind the officers' pointing of guns at Leyalina on February 26, 2020. The excessive force used against Leyalina was an example of and result of this *de facto* policy.

161. Similar incidents of excessive force against children are the direct and foreseeable result of the same set of City policies. For example, on August 29, 2013, Chicago police officers of the Area Central Gun Team executed a search warrant at 930 N. Keystone Avenue in Chicago for a person with no connection to the residence and pointed a rifle with a laser light directly at the chest of 3-year-old Davianna Simmons and pointed a handgun at her grandmother Emily Simmons' head in front of Davianna when neither presented any threat to officers. The Simmons are African-American. The officers were never investigated or disciplined for the incident.

162. On January 29, 2015, while executing a search warrant at 1856 S. Lawndale, 2nd floor apartment, in Chicago for a person who had long been incarcerated, Chicago

police officers of Narcotics Unit 189 and the SWAT Alpha team pointed their assault rifles directly at brothers Justin and Jeremy Harris and Jaden Fields, ages 4, 6 and 11, respectively, and at their mother, Jolanda Blassingame, when the family did not pose any apparent threat to officers. Ma. Blassingame and her children are African-American. The officers were never investigated or disciplined for the incident.

163. On November 7, 2017, while executing a search warrant at 3557 S. Damen Avenue, 2nd floor, in Chicago for a target who actually lived in the building's 3rd floor apartment, a group of patrol officers pointed a handgun and an assault rifle directly at 5- and 9-year-old Jack and Peter Mendez and their parents, Hester and Gilbert Mendez, when none of them presented any apparent threat to officers. The Mendez family is Latino. The officers have not been investigated or disciplined for the incident.

164. On August 9, 2018, while executing a search warrant at 5033 S. Hermitage, 1st floor apartment, in Chicago for a person with no connection to the apartment or the residents (he was apprehended next door), members of the Area South Gun Team and the Alpha SWAT team pointed assault rifles at a 4-year-old girl, Lakai'Ya Booth, her 8, 11 and 13-year-old siblings, and their mother and grandmother, Ebony Tate and Cynthia Eason, when none of them presented any apparent threat to officers. Ms. Tate, her children and mother are African-American. The officers have not been investigated or disciplined for the incident.

165. On March 15, 2019, while executing a search warrant at 8914 S. Laflin in Chicago, members of the 7th District Tactical Team and the SWAT Alpha Team pointed assault rifles at 6, 8, and 9-year-old Royalty, Royal and Roy Smart and their mother, Domonique Wilson, as they walked from their house to the street with their hands up and then handcuffed 8-year-old Royal for approximately 40 minutes when none of them presented any apparent threat

to officers. Ms. Wilson and her children are African-American. The officers have not been investigated or disciplined for the incident.

166. On December 25, 2019, while investigating a robbery in Rogers Park, Chicago patrol officers entered a family's condominium at 1227 West Albion Avenue in Chicago without authorization and pointed handguns at 13-year-old Lazerick James, handcuffed one of his wrists, and dragged him through the apartment for several minutes before realizing their mistake, apologizing and departing. Lazerick is African-American. The officers have not been investigated or disciplined for the incident.

167. Through their combined failures above, before and after actual and constructive notice, to enact official reforms that protect children from excessive and unnecessary force and to hold accountable officers who use excessive force against them or in their presence, the City has led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, CPD's Bureau of Internal Affairs ("BIA"), the Chicago Police Board, the Independent Police Review Authority ("IPRA"), the Civilian Office of Police Accountability ("COPA") or the City of Chicago Inspector General ("IG"). These past failures directly authorized, encouraged and emboldened defendant officers' conduct against and in the presence of Leyalina, providing them a general license to use excessive force, including excessive force against minors, whenever it suited them.

168. Thus, through their combined failures, before and after actual notice, to enact official policies protecting citizens, including children, from excessive or unnecessary force and to hold accountable officers who use excessive force against or in the presence of children, final City of Chicago policy-makers – including the Superintendent of police, the Administrator of IPRA (now COPA), the head of CPD's BIA, the IG, the Mayor, and the

34

Chicago City Council – condoned, approved, authorized, facilitated, encouraged and perpetuated a *de facto* City policy and practice of unnecessary or excessive force against or in the presence of children and youth.

169. Finally, during all times relevant to the incident involving plaintiffs, a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA, the Chicago Police Board, IPRA and COPA, contributing to these agencies' collective failure to properly investigate and discipline officer excessive force, including excessive force against children and youth and/or their close relatives in the minor's presence. Defendant officers' conduct toward Leyalina, including their failure to intervene and failure to report the actions of their colleagues, was the direct and foreseeable result of the long-standing and systematic code of silence at work in the City's police investigative and disciplinary systems.

170. By means of its pervasive customs and practices above and its failures, after notice, to remedy officers' use of excessive or unnecessary force, including against or in the presence of children and youth, defendant City of Chicago has manifested conscious and deliberate indifference to the deprivation of Leyalina's constitutional rights.

171. One or more of these four official policies, failures of official policy, practices and customs collectively, were the moving force behind defendant officers' conduct that directly and proximately caused the violations of Leyalina's constitutional rights set forth above and below, such that the City of Chicago is liable for officers' conduct.

### The City of Chicago's <u>De Facto</u> Policies Resulted in Violations of Plaintiff's Constitutional Right to be Free of Excessive Force

172. Officers' conduct toward plaintiff constituted excessive force, in violation of her rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

173.    Under the circumstances, officers' pointing of guns at Leyalina and other displays of force against and in the presence of Leyalina were totally unnecessary, unreasonable and unjustifiable.

174.    Under the circumstances, officers' uses of force against and in the presence of Leyalina, undertaken in the presence of and witnessed by other plaintiffs, were totally unnecessary, unreasonable and unjustifiable.

175.    Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Leyalina's constitutional rights.

176.    Officers' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

177.    The officers' misconduct was undertaken pursuant to and as the direct, foreseeable and proximate result of the Defendant City of Chicago's *de facto* policy, failures of official policy, absences of affirmative policy, and pervasive, long-standing practices and customs, as set forth above, such that defendant City of Chicago is liable for officers' use of excessive force against and in the presence of Leyalina.

178.    Further, no officer present on the scene intervened to stop officers from pointing guns at Lille.  One or more officers had a reasonable opportunity to prevent or stop the violations of Leyalina's constitutional rights but stood by and failed to take any action.

179.    As set forth above, the officer misconduct was undertaken pursuant to the *de facto* policies, long-standing and pervasive practices and customs of defendant City of Chicago, such that the City of Chicago is also liable for officers' failure to intervene.

180.    Officers' inactions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiff's constitutional rights.

36

181.     As the direct and proximate result of officers' misconduct, Leyalina has suffered and continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

### COUNT II – UNLAWFUL SEARCH – INVALID WARRANT - 42 U. S. C. § 1983
**(All Plaintiffs)**

182.     Plaintiffs re-allege paragraphs 1-26 and 40-148 above and incorporate them into this count.  They assert this claim against defendant officer Tellez, the CPD lieutenant who approved the search warrant, believed to lt. Marcellino, and any other defendant officers known and unknown who participated in obtaining the search warrant for their apartment.

183.     These defendant officers unreasonably approved, obtained and executed a search warrant for a person who, officers knew or should have known, did not live there and could not be found there, a fact which invalidated the warrant from the start, prior to execution.

184.     Officers' subsequent unauthorized entry and search violated plaintiffs' Fourth Amendment right to be free from unreasonable searches of their persons and homes.

185.     As the sworn applicant for the warrant, officer Tellez and those who assisted him had an official duty to discover and disclose to the issuing magistrate whether he had identified the correct address or place to be searched and not the residence of an innocent third party.

186.     Officer Tellez, Lt. Marcellino who approved the search warrant, and other defendant officers reasonably knew or should have known that the intended target(s) of the warrant would not be found at plaintiffs' address.

187.     Officer Tellez and the other officers had an official duty to reasonably investigate and verify information they received from the felonious John Doe about the target's whereabouts.

37

188.    Such an inquiry was so simple to make by means of the sources listed above.  Officer Tellez and other officers had multiple sources of information available to them at the time, had they bothered to use them.

189.    But, on information and belief, officer Tellezand others recklessly did not conduct any investigation or verification or failed to conduct a reasonable one.  The CPD lieutenant who approved the search warrant, believed to be Lt. Marcellino, failed to verify that officer Tellez had performed an adequate independent investigation such that probable cause existed.

190.    Consequently, in his complaint for search warrant defendant Tellez identified the wrong address, plaintiffs' address, a place he never had probable cause to enter and search.  Because defendant officers recklessly and utterly failed to independently investigate and verify the place to be searched, theirs was not a good faith error.

191.    The CPD Lieutenant who approved officer Tellez's application for search warrant, believed to be Lt. Marcellino, did so without ensuring that he and other officers had performed the due diligence required by CPD Special Order S04-19.

192.    Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

193.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

194.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking inaction in failing to perform required and basic reasonable due diligence to verify the correct location for a search warrant before raiding

and searching citizens' residence constituted an abuse of power and authority. Defendant officers' actions – of relying solely on location information provided by a criminally active confidential informant and not conducting their own investigation and surveillance - were directed towards honest, hard-working citizens who were totally innocent of all criminal conduct.

195. Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others. Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved. Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

196. In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

### COUNT III – UNLAWFUL SEARCH – UNREASONABLE MANNER OF ENTRY AND SEARCH – 42 U. S. C. § 1983
### (All Plaintiffs)

197. Plaintiffs re-allege paragraphs 1-26, 40 - 148 and 181-195 above and incorporate them into this count. They assert this claim against all defendant officers known and unknown who entered and/or searched their apartment.

198. The manner in which officers conducted their entry into and search of plaintiffs' apartment were objectively unreasonable, in violation of Plaintiffs' Fourth Amendment rights.

199. For example, when these officers entered plaintiffs' apartment, they forcefully entered plaintiffs' building and apartment without knocking and announcing themselves and their office in circumstances where it was required, they screamed and cursed at

plaintiffs, they intentionally damaged or destroyed plaintiffs' personal property, and they did nothing to arrange for repair of the damage.

200.    In addition, officers' exceeded both the physical and legal scope of the search warrant.

201.    Further, it was unreasonable for officers to detain plaintiffs for the amount of time that they, which was longer than necessary to complete a search for a handgun, and in the degrading humiliating manner they did by calling them names and refusing to allow them to go to the bathroom.

202.    Officers' manner of entry and search was objectively unreasonable in these and other ways and was undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

203.    Under the circumstances, officers had reasonable alternative law enforcement techniques available to them for effective entry and search.

204.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent

205.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking displays of force against a totally unarmed family constituted an abuse of power and authority.  Defendant officers' actions set forth above were directed towards unarmed citizens who were fully compliant and cooperative and innocent of all criminal conduct.

206.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a

40

conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved. Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

207. In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, defendants' conduct merits an award of punitive damages.

## COUNT IV – FALSE ARREST AND FALSE IMPRISONMENT – 42 U. S. C. § 1983
### (All Plaintiffs)

208. All plaintiffs re-allege paragraphs 1 – 26 and 40-148 above and incorporate them into this count. They assert this claim against defendant officers who detained them for too long, in an unreasonable manner and under degrading conditions and against those who declined to intervene in same.

209. These defendant officers arrested and imprisoned plaintiffs, including a young child, when, without a valid search warrant, a warrant for their arrest and without probable cause to arrest, they confined them for longer than required to conduct a search for a handgun and in a humiliating manner by pointing guns at them for several minutes, calling them names and without allowing them to go to the bathroom. This was unreasonable under the circumstances, given that they were not suspects, posed no threat whatsoever to officers, and officers should have completed the search much sooner.

210. Officers' actions constituted a violation of plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

211. When these defendant officers confined plaintiffs in this manner, they unlawfully deprived them of their dignity and their liberty to move about, despite the fact that they had not done nothing illegal, were not a safety threat, and that officers had no probable

cause for their arrest and imprisonment.  This violated plaintiffs' rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

212.    Moreover, each defendant officer had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights but stood by and failed to take any action.

213.    Through physical force and the invalid use of legal authority, officers acted to arrest, restrain and confine plaintiffs to a bounded area.

214.    Plaintiffs, including a child, were acutely aware of and were harmed by officers' confinement, as detailed above.

215.    Defendant officers' actions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

216.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continued to suffer injury and harm.

## COUNT V – UNCONSTITUTIONAL SEIZURE OF PROPERTY - 42 U. S. C. § 1983
### (All Plaintiffs)

217.    Plaintiffs incorporates paragraphs 1-26, 40-148 and 197-207 above and assert this claim against defendant officers known and unknown who participated in the search of plaintiff's residence and the destruction of their personal property.

218.    As set forth above, defendant officers unnecessarily and willfully damaged or destroyed plaintiffs' personal property during the course of their search.  Defendant officers took these actions without any lawful basis and without ever returning plaintiffs' property to them or paying them compensation for damage or destruction they caused.

219.    Defendant officers' actions constituted an unreasonable seizure of plaintiffs' property, in violation of their rights under the Fourth Amendment and Fourteenth

Amendments to the U. S. Constitution, as well as a deprivation of property without due process of law, in violation of their rights under the Fourteenth Amendment.

220. Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful, malicious and reckless indifference to plaintiffs' constitutional rights.

221. Defendants' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

222. As a result of defendant officers' misconduct described in this Count, plaintiffs have suffered injury, including deprivation of their right to property, financial harm and emotional distress.

## COUNT VI – ASSAULT – STATE LAW
### (All Plaintiffs)

223. Plaintiffs re-allege and incorporate paragraphs 1-26 and 40-148 above in this count. They assert this claim against all defendant officers known and unknown who entered plaintiffs' apartment.

224. The actions of the defendant officers set forth above, including pointing guns at close range at the plaintiffs, created reasonable apprehensions in plaintiffs of immediate harmful contact to plaintiffs' persons. Under the circumstances, these actions exceeded the lawful scope of police officers' use of force.

225. The officers intended to bring about apprehensions of immediate harmful contact in plaintiffs or knew that their actions would bring about such apprehensions.

226. In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

227. The conduct of defendants in entering and executing a residential search warrant and pointing guns at the residents is generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

228. The officers' actions were the direct and proximate cause of plaintiffs' apprehensions.

229. Plaintiffs have been seriously harmed by officers' actions.

## COUNT VII – FALSE ARREST AND FALSE IMPRISONMENT– STATE LAW
### (All Plaintiffs)

230. All plaintiffs re-allege paragraphs 1 – 26 and 40 – 148 above and incorporate them into this count. They assert this claim against all defendants officers who unreasonably detained them and those who refused to intervene in same.

231. These defendant officers arrested and imprisoned plaintiffs, including a young child, when, without a valid search warrant, a warrant for their arrest and without probable cause to arrest, they confined them for longer than required to conduct a search for a handgun and in a humiliating manner by pointing guns at them for several minutes, calling them names and without allowing them to go to the bathroom. This was unreasonable under the circumstances, given that they were not suspects, posed no threat whatsoever to officers, and officers should have completed the search much sooner. Officers' actions restrained plaintiffs and confined them to a small, bounded area.

232. These defendant officers intended to restrain and confine plaintiffs to bounded areas within or outside the house.

233. In the alternative, the conduct of these defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or

which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

234.    The conduct of these defendant officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

235.    Officers' actions caused the restraint and confinement of plaintiffs to a small, bounded area within their residence.

236.    Plaintiffs were harmed by these officers' actions in restraining and confining them, as detailed above.

## COUNT VIII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – STATE LAW
### (All Plaintiffs)

237.    Plaintiffs re-allege and incorporate paragraphs 1-26 and 40-148 above in this count and assert this claim against all defendant officers known and unknown who entered plaintiffs' apartment.

238.    The actions, omissions and conduct of defendant officers set forth above – including but not limited to pointing guns at plaintiffs, including Leyalina - were extreme and outrageous and exceeded all bounds of human decency.

239.    Officers' actions, omissions and conduct above were undertaken with the intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high probability that their conduct would cause such distress, or in reckless disregard of the probability that their actions would cause such distress.

45

240. Officers, who occupied positions of special trust and authority, knew, had reason to know or believed that plaintiffs' family, which included a young child, were especially vulnerable and fragile.

241. As a direct and proximate result of officers' extreme and outrageous conduct, plaintiffs suffered and continue to suffer long-term, severe emotional distress and trauma.

242. In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

243. The conduct of defendants in entering and executing a residential search warrant and pointing guns at residents are generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

244. Officers' conduct was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

## COUNT IX - TRESPASS – STATE LAW
### (All Plaintiffs)

245. Plaintiffs re-allege paragraphs 1-26 and 40-148 above and incorporate them in this count. Plaintiffs assert this claim against all defendant officers known and unknown who entered plaintiffs' apartment.

246. By obtaining and executing the search warrant when officers did not have independent probable cause to believe that drugs were being sold from plaintiffs' apartment, defendant officers did not have legal authorization to enter and search plaintiffs' property.

Consequently, they physically invaded plaintiffs' right to and enjoyment of exclusive possession of their residence.

247. In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

248. The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

249. Officers' actions caused a physical invasion of plaintiffs' residence.

250. Plaintiffs were harmed by officers' physical invasion of their residence.

### COUNT X – *RESPONDEAT SUPERIOR* – STATE LAW
**(All Plaintiffs)**

251. Plaintiffs re-allege paragraphs 1-26, 40-148 and 223 – 250 above and incorporate them into this count. Plaintiffs assert this claim against defendant City of Chicago.

252. In committing the acts and omissions alleged above, defendants officers were at all times members and agents of CPD and the City of Chicago and were acting within the scope of their employment.

253. Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its agents within the scope of their employment.

### COUNT XI – INDEMNIFICATION – STATE LAW
**(All Plaintiffs)**

254. Plaintiffs re-allege and incorporate paragraphs 1-26, 40-148 and 223 – 250 above. Plaintiffs assert this count against defendant City of Chicago.

255. Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

256. Defendant officers were and are employees of the City of Chicago who acted within the scope of their employment when committing the actions and omissions detailed above.

<u>**PRAYER FOR RELIEF (ALL COUNTS)**</u>

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendant on each count for:

    a.    Compensatory damages;

    b.    Punitive damages where pled in the counts above;

    c.    Reasonable attorney's fees and litigation costs and expenses; and

    d.    Such other or further relief as the Court deems just.

Respectfully submitted,

<u>s/Al Hofeld, Jr.</u>
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com

48

## JURY DEMAND

Plaintiffs demand trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Al Hofeld, Jr., an attorney for plaintiffs, hereby certify that on August 27, 2020, filing and service of the foregoing *Complaint* was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 and the Federal Rules of Civil Procedure as to service on any party who is not a Filing User or represented by a Filing User.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com

49